```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF TENNESSEE

 3                       AT CHATTANOOGA
      ----------------------------------------------------------
 4                                   :
      UNITED STATES OF AMERICA,      :
 5                                   :
                Plaintiff,           :
 6    -versus-                       :           CR-4-09-52
                                     :
 7    TRAVIS KING,                   :
                                     :
 8              Defendant.           :
      ----------------------------------------------------------
 9                                  Chattanooga, Tennessee
                                    March 29, 2010
10

11          BEFORE:  THE HONORABLE HARRY S. MATTICE, JR.,
                       UNITED STATES DISTRICT JUDGE
12
      APPEARANCES:
13
                FOR THE PLAINTIFF:
14
                JOHN MacCOON,
15              Assistant United States Attorney
                1110 Market Street, Suite 301
16              Chattanooga, Tennessee 37402

17
                FOR THE DEFENDANT:
18
                BRENT O. HORST, ESQ.,
19              P.O. Box 160690
                1114 McChesney Avenue
20              Nashville, Tennessee 37216

21

22                        JUDGMENT PROCEEDINGS
23                        PAGES 1 THROUGH 34

24

25
```

1

2

3                       INDEX OF PROCEEDINGS

4

5   DONNA MOORE,
          Direct Examination By Mr. Horst              10
6         Cross-Examination By Mr. MacCoon              18

7   JIM TOLLISON,
          Direct Examination By Mr. Horst              22
8         Cross-Examination By Mr. MacCoon             24

9   DEBORAH REED,
          Direct Examination By Mr. Horst              25
10
    CANDACE KING,
11        Direct Examination By Mr. Horst              27

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  The clerk will call the first case.

 2              THE CLERK:  Criminal Action 4-09-CR-52, United States

 3    of America versus Travis King.

 4              THE COURT:  Would counsel identify themselves?

 5              MR. MacCOON:  John MacCoon for the United States,

 6    Your Honor.

 7              MR. HORST:  Brent Horst for Mr. King, Your Honor.

 8              THE COURT:  All right.  All right.  Mr. King, we're

 9    here for your sentencing today.  Why don't you and your

10    attorney come to the podium, please.

11              All right.  Now, counsel, am I correct there is no

12    plea agreement in this case.  Correct?

13              MR. HORST:  That is correct, Your Honor.

14              MR. MacCOON:  Yes.

15              THE COURT:  All right.  Mr. King, my question to you,

16    have you received and had a chance to review the presentence

17    investigation report in your case that's been prepared by the

18    Court's probation office?

19              THE DEFENDANT:  No, sir.

20              THE COURT:  You haven't.  Okay.  Mr. Horst, is

21    there --

22              MR. HORST:  Judge, I apologize for that.  I went to

23    see Mr. King about two weeks ago, due to the fact he was

24    incarcerated he did not wish for me to leave the copy with him

25    because of the nature of the charges.
```

1          THE COURT:  Okay.

2          MR. HORST:  I did discuss with him, basically, the

3    basic parameters of what was in the presentence report but he

4    has not seen it and went through it, so.

5          THE COURT:  Well, let's talk about that then because,

6    Mr. King, here is what I want you to understand about the

7    importance of the presentence investigation report.  The

8    information in that report is basically all I know about you.

9    Okay.  In making my judgment as to what would be an appropriate

10   sentence in this case, I am to consider your history and

11   characteristics and the nature and circumstances of this

12   particular offense, among other things.  Okay.  And what I know

13   about the nature and circumstances of this offense as well as

14   your personal history and characteristics comes pretty solely

15   from that presentence investigation report.  Are you following

16   me?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  So, as you might be able to see that is

19   of critical importance.  Because it's not too much to say as

20   you see, the way our system works, your fate is in my hands so

21   to speak right now, and it's important that that report be as

22   accurate as possible to give me a fair assessment of who you

23   are, where you come from, how we got to this point, and so

24   forth.

25         So, having said all of that, I think I would be much

1   more comfortable if you had an opportunity to pretty carefully

2   review the report with your attorney and make sure that it is

3   correct and complete to the best of you and your attorney's

4   judgment.  Okay.

5               THE DEFENDANT:  Okay.

6               THE COURT:  Has there been -- I take it there has not

7   been adequate opportunity to accomplish that in this case.  Is

8   that right?

9               MR. HORST:  Well, Judge, there has.  And I take full

10  responsibility for him not actually looking at the actual

11  report.  And what I should have done and just didn't do, I had

12  taken the copy with me, as I said, about two weeks ago when we

13  met.  I had planned to leave with him copies of everything --

14              THE COURT:  Well, I can understand why you don't want

15  to leave copies.  It's a confidential report.  You don't like

16  to leave it in the jail.

17              MR. HORST:  But I should have -- what I should have

18  done is sat down with him at that time and gone through it with

19  him page by page.

20              THE COURT:  Taken as much time as needed.

21              MR. HORST:  Yes, sir, what I --

22              THE COURT:  Let me ask you this, counsel.  Do you

23  have witnesses to put on today?

24              MR. HORST:  I do, Judge.  But I understand you have

25  another case, if you want to take that case up, I think we can

1   do this in that --

2            THE COURT:  Here's what I think should happen.  Let's

3   do as much as we can on this case today.  It may or may not be

4   necessary for me to continue it --

5            MR. HORST:  Yes, sir.

6            THE COURT:  -- to give everybody additional time.

7   Mr. MacCoon, do you have any objection?

8            MR. MacCOON:  No, Your Honor.

9            THE COURT:  All right.  Well, let's do this.  I've

10  got a couple of more sentencings this morning, let me go ahead

11  and turn my attention to those and let's see what, where we

12  are.  Even if it does become necessary for me to continue this

13  sentencing, I would recommend that we do as much as we can

14  today, for instance, if there are witnesses to put on, let's go

15  ahead and get them on the record and so forth and then see

16  where we are.

17           MR. HORST:  Very good, Judge.  In the meantime, I'll

18  get that to him.

19           THE COURT:  Why don't you go back there and the

20  marshals can arrange -- marshals, can you arrange to give them

21  a little bit of privacy to consult, whatever you can do back

22  there?

23           THE MARSHAL:  We'll see what we can do, Your Honor.

24           THE COURT:  All right.  You just go on back there,

25  Mr. Horst, and I understand sometimes it's crowded down there,

```
 1    they've got a couple of rooms, maybe they can work something
 2    out there with you.
 3              MR. HORST:  Yes, sir.
 4              (Short recess.)
 5              THE COURT:  All right.  The clerk will call the next
 6    case.  I believe that's Mr. -- let's see where we are on Mr.
 7    King.
 8              THE CLERK:  Criminal Action No. 4-09-CR-52, United
 9    States of America versus Travis King.
10              THE COURT:  All right.  Mr. Horst, where are we?  Has
11    Mr. King now had an opportunity to review his presentence
12    investigation report?
13              MR. HORST:  He has, Your Honor.  He has read it page
14    to page.  I believe he'll announce or I'll announce on his
15    behalf and the Court can inquire.  There are no objections.
16              THE COURT:  All right.  Okay.  You have, Mr. King,
17    now have had an opportunity to review the presentence
18    investigation report?
19              THE DEFENDANT:  Yes, sir.
20              THE COURT:  All right.  And you have no objections.
21    Correct?
22              THE DEFENDANT:  Correct.
23              THE COURT:  All right.  Mr. MacCoon, any objections
24    by the government?
25              MR. MacCOON:  No, Your Honor.
```

1          THE COURT:  All right.  Then in the absence of

2    objections, I am going to order the presentence investigation

3    report be made a part of the record in Mr. King's case.  I

4    further find that the presentence investigation report

5    accurately reflects the facts state therein and correctly

6    calculates the advisory guidelines applicable to Mr. King's

7    case, that reflects a total offense level of 26, criminal

8    history category of one, resulting in an advisory guideline

9    range of 63 to 78 months.  Do you agree with that, Mr. Horst?

10          MR. HORST:  Yes, sir, Judge.  Is that before or after

11    the additional downward for acceptance --

12          MR. MacCOON:  That's after.

13          MR. HORST:  -- acceptance of responsibility?

14          THE COURT:  That is after.

15          MR. HORST:  Okay.

16          THE COURT:  The three or the two or three-level

17    departure for or adjustment for acceptance, the three-level

18    adjustment for acceptance of responsibility.

19          MR. HORST:  That's correct.

20          THE COURT:  The calculation is on Page 5 of the

21    presentence investigation report.

22          MR. HORST:  To answer your question, yes, that is

23    correct.  That is what my understanding was.

24          THE COURT:  Do you agree with that, Mr. MacCoon?

25          MR. MacCOON:  I do, Your Honor.

```
 1          THE COURT:  Now, you have filed a motion for a
 2   sentence below the advisory guideline range.  And I have read
 3   that.  You've attached some substantial documentation to that,
 4   Mr. Horst.  So, I am -- and the government has opposed it, as
 5   you know.
 6          MR. HORST:  Yes, sir.
 7          THE COURT:  I am now ready to take up your motion.
 8   Let me ask you first.  I'll let you handle this however you
 9   want.  Do you want to argue first and do you have any witnesses
10   you want to put on?
11          MR. HORST:  Judge, I do.  I have one substantive
12   witness, Dr. Moore, who's evaluated Mr. King.
13          THE COURT:  How do you want to proceed?  Do you want
14   to make an argument or do you want to go ahead and put Dr.
15   Moore on?
16          MR. HORST:  Let's put the witnesses on, Your Honor.
17          THE COURT:  Mr. King, why don't you have a seat over
18   at counsel table.  All right.  Is Dr. Moore in the courtroom?
19   Why don't you come forward, Dr. Moore, up here to the witness
20   stand.  Come up here, Dr. Moore, and right before you step into
21   the witness box and have a seat, please raise your right hand
22   and Ms. Scott here will swear you in and then make yourself
23   comfortable.
24                         DONNA MOORE,
25   called as a witness at the instance of the Defendant, being
```

1    first duly sworn, was examined and testified as follows:

2             THE COURT:  Get yourself settled, Dr. Moore.  Pour

3    yourself some water, if you'd like.  And then, Mr. Horst, you

4    can proceed whenever you're ready.

5             MR. HORST:  Thank you, Your Honor.

6                          DIRECT EXAMINATION

7    BY MR. HORST:

8    Q        Please state your name.

9    A        Donna Moore.

10   Q        And, Ms. Moore, what is your employment?

11   A        I'm a licensed psychologist and I have a private

12   practice in Brentwood, Tennessee.

13   Q        All right.  And what level of licensure do you hold?

14   A        I have a Ph.D. in psychology.

15   Q        All right.  And what is your area of specialty or

16   expertise so to speak?

17   A        The area of specialty is forensic psychology, more

18   specifically, in evaluating and treating people with sexual

19   behavior problems.

20   Q        All right.  And how long have you treated, I'm just

21   going to short-term it and call it sexual offenders, how long

22   have you treated sexual offenders?

23   A        Since 1993.  I started working after I got my

24   master's degree, I started working in community mental health,

25   working in the sex offender treatment program.  And since that

1    time, the majority of my practice has been in evaluating and

2    treating offenders either in inpatient facilities, in the

3    prison system, outpatient facilities, and community mental

4    health or in my private practice.

5    Q          All right.  And do you, in fact, do work for the

6    federal courts in the Middle District of Tennessee?

7    A          Yes.  I contract with Centerstone Community Mental

8    Health and we have the contract for the middle district.

9    Q          All right.  And as part of that, I assume you would

10   treat sex offenders who are ordered into treatment through

11   that court system?

12   A          Yes.  In my private practice they are state ordered

13   defendants or clients.

14   Q          Now, if I may ask you briefly because my guess is

15   that the Court has some familiarity with these, but what is a

16   psychosexual exam?

17   A          It's an evaluation that really I think of it as a

18   snapshot of what somebody is presenting when they come into

19   the office, and much like when we go to a doctor if we're

20   sick, it's looking at what kind of psychological or

21   psychosexual problems a person might have and what kind of

22   treatment needs that might come from those problems.  And,

23   again, the problems relate to some kind of sexual misconduct.

24   Q          And what are the parts or components of a

25   psychosexual exam?  What do you do to administer that exam?

1   A        I conduct a clinical interview with the client and

2   get some background history information.  I also do a mental

3   status exam just to make sure that they are not suffering from

4   any kind of psychiatric condition that would prevent them from

5   getting some kind of treatment.  And I do psychological

6   testing, again, to rule out any underlying psychological

7   disorder and, also, to assess their attitude toward test

8   taking because of their validity indices in the psychological

9   test, when appropriate I use standard risk assessment measures

10  which were not appropriate in this case.  I also review

11  records when they're available and consider all of this.

12  Q        All right.  Now, did you at one point -- were you at

13  one point referred Travis King to evaluate and then begin

14  treatment?

15  A        Yes.

16  Q        And when you met with Mr. King -- let me ask you

17  this first.  Is sometimes a polygraph exam a part of the

18  psychosexual evaluation?

19  A        Sometimes yes.  Some -- a number of people that are

20  referred are in denial or lying about their conduct, and so in

21  those cases, we require or request a psychosexual evaluation

22  to include the polygraph because, again, if somebody is being

23  accused of some misconduct, it's not uncommon or atypical for

24  them to deny it.  And rather than say I can't make a

25  determination because I don't determine whether the person is

1    guilty or not, the polygraph has been accepted as one of the

2    tools that we use in managing and treating offenders, so if

3    somebody is in denial at the evaluation stage, that would be

4    referred as part of the evaluation.

5    Q        And did you administer a polygraph exam in the case

6    on Travis?

7    A        No, I did not.  When he came in, he was

8    acknowledging sexually inappropriate thoughts and behaviors

9    which would suggest that he would be appropriate to be

10   accepted into treatment.  As part of the typical protocol for

11   treating offenders in the program, he would have had a

12   polygraph within a couple of months, a sexual history

13   polygraph, but he was incarcerated before we were able to get

14   to that.

15   Q        Okay.  Now, and I read in your report and the

16   probation office kind of focused in on that in their response

17   in regards and you mentioned it earlier, but the lack of

18   formal risk assessment for this situation.  Can you explain

19   what you mean by that?

20   A        Well, typically, one of the best tools that we use

21   is called the Static-99 and it looks at actuarial traits of a

22   person in predicting their risk for reoffense.  When we're

23   looking at sexual deviance and recidivism, we're looking at

24   static traits which are unchangeable and dynamic traits that

25   are changeable.  And the Static-99 looks at those static

1    traits.

2           It's not appropriate for use with people whose

3    charges are possession or distributing child pornography.

4    It's to be used with people or offenders who have been charged

5    with a sexual offense that involves some targeted child.  Now,

6    if there is a history of somebody having those kinds of

7    offenses, then it is appropriate to use it.  It's called a

8    category B offense, child pornography possession is a category

9    B, whereas, a direct offense that targets a victim, such as,

10   obviously, a contact offense, but even exhibitionism or

11   voyeurism, targeting a person are considered category A.  So,

12   we use it for category A offenses.  The Static-99 has not,

13   does not have normative data for child pornography offenders,

14   so we really just look at some of the traits that a person

15   would present with.  That's why I looked at the dynamic traits

16   that he has.

17   Q       So, let me try to sum this up and correct me if I'm

18   wrong, and I don't want to put words in your mouth, but for

19   what Mr. King has been accused of and admitted to, there is no

20   formal test that's been developed.  Am I correct so far?

21   A       Correct.  Correct.

22   Q       And but now, despite that, do you feel that what you

23   did do to evaluate him is still valid despite the fact that

24   there are formal risk assessments?

25   A       Yes.  Because, again, to use a test that's not, does

1   not have a normative group would not be an appropriate or

2   ethical use of that instrument.  And, again, as part of my

3   experience and history working in the Federal Bureau of

4   Prisons program at Butner, North Carolina where the majority

5   of the offenders there came in with possession charges, we did

6   not use it on them either.

7   Q        Now, how many -- you had an initial evaluation with

8   Mr. King.  Correct?

9   A        Correct.

10  Q        And then did you have any treatment session after

11  that?

12  A        I did.  I met with him five additional times,

13  individual sessions that I met Mr. King and on one occasion

14  his wife came with him to kind of orient them both to the

15  program.  And it was getting started.  And, again, he was

16  unable to come because of his incarceration, but we were

17  getting started, and he was scheduled to begin group therapy.

18  And he was going to be put into a sex offender treatment

19  group.

20  Q        Based upon your initial evaluation and the five

21  treatment sessions, did you have enough opportunity to make,

22  reach an opinion as to what your opinion would be as to Mr.

23  King's risk of reoffense?

24  A        Well, again, based upon the absence of prior

25  charges, based upon things that we would consider in a static

1    assessment that were not present, based on the dynamic traits,

2    again, he was absent psychiatric personality traits, such as

3    narcissistic personality, antisocial personality.  He did not

4    have a history of misconduct as a child.  He did not -- he was

5    not suspended or expelled from school.  He did not have a poor

6    work history.  So, those things speak to general self

7    regulation.  He didn't have those problems.  So, based upon

8    kind of the absence of a lot of those factors, I assessed his

9    risk to be low and that he could be treated in an outpatient

10    program.

11    Q        Okay.  Can you put it in the terms of comparing him

12    with, you know, this large group of sex offenders that you've

13    treated over the years or where would he fall within that low

14    risk, I mean, would you call it very low, moderate, I mean,

15    is -- how different is he, if at all, from the normal if there

16    is such a thing sex offender?

17    A        Well, I think that the majority of persons that I

18    evaluate in the community are going to be low risk because,

19    again, one of the things that elevates someone's score on a

20    typical risk assessment it relies on a history of sex

21    offenses.  So, it's not uncommon to find a number of first

22    time offenders, a lot of people I evaluated are going to be

23    low because of the absence of data.

24            I think, again, Mr. King did not have a history of

25    multiple sexual partners, which I often see.  He did not have

1    history of a lot of the other kind of general not necessarily

2    rising to the level of criminal misconduct, but problems

3    getting along with family, problems at work. He didn't tend

4    to have those. He also came in and took responsibility and

5    seem motivated to work, which is a little more atypical. I

6    tend to see people after the court has ordered them to come

7    in. So, I think that based upon what I know at this time,

8    again, the snapshot, he's a low risk.

9    Q        Okay. And, again, briefly, because I suspect that

10   the Court has a good familiarity already with this, but what

11   treatment options are there available for Travis out of the

12   prison system in the community?

13   A        Well, there are, in Tennessee, we have the sex

14   offender treatment board which monitors and provides a

15   standard of care for offender evaluation and treatment in the

16   state. And there are a number of providers approved by that.

17   And I believe in this area Counseling and Consultations

18   Services, Dr. Mike Adler has several programs in this area,

19   and there are others as well that are similar to the program I

20   have in Middle Tennessee. They provide treatment in a

21   containment model that involves monitoring by the probation

22   department, regular polygraphs, at least two a year, and

23   treatment that fits the standards or follows the standards of

24   the sex offender treatment board.

25   Q        Then based upon your familiarity with the treatment

Case 4:09-cr-00052-HSM-SKL   Document 32   Filed 08/23/10   Page 17 of 35   PageID #: 230

1    options to this court in this district, do you, is it your

2    opinion that Mr. King can be successfully treated in those

3    outpatient programs that are available?

4    A       Yeah.  I think his treatment level is such that he

5    could be appropriately treated.

6            MR. HORST:  Thank you.  No further questions.  Thank

7    you.

8            THE COURT:  Cross-examination?

9            MR. MacCOON:  Yes, Your Honor.

10                     CROSS-EXAMINATION

11   BY MR. MacCOON:

12   Q       Morning, Dr. Moore.  You said in the normal course

13   of treatment he would have been given a polygraph and you

14   never got around to that.  Is that --

15   A       Correct.

16   Q       -- fair to say?

17   A       Correct.

18   Q       So, it is something that you really want to know how

19   a person in this situation would respond, that's why you give

20   it.  Right?

21   A       Correct.

22   Q       So, in a sense, we have an incomplete picture at

23   this point because we don't know how he would do with a

24   polygraph?

25   A       Correct.  Again, I look at it as a snapshot, and,

1    again, we put more snapshots together.  Yes.

2    Q          Right.  But it would increase your confidence in

3    your prediction of his behavior if you had those results,

4    would it not?  Or perhaps change your mind, I mean, he could

5    conceivably fail a polygraph as to whether he had previous

6    sexual encounters with children, for example?

7    A          Correct.  Correct.

8    Q          So, right now, you just don't know how he would do

9    on that and it is a relevant factor.  Is that fair to say?

10   A          Correct.  Correct.  It would be something, it would

11   confirm or add more information for me to adjust the

12   assessment.

13   Q          And when you say to reoffend, you mean to reoffend

14   in the sense of possessing child pornography or --

15   A          Overall.  Any kind of sexual misconduct.

16   Q          Okay.

17   A          Including any kind of contact sexual offense, he's

18   in a low risk.

19   Q          Have you ever had occasion to compare your

20   predictions about risk with reality as looking down the road,

21   have you ever followed up?  Can you give us some idea of your

22   rate of success in predicting these things?

23   A          Well, I tend to do better with people that I say are

24   at higher risk.  And I tend to hear about them because they

25   come into the system again.  So, I know that people with

1   certain traits that I had said when I assessed them that they

2   would not do well and another provider might have accepted

3   them into treatment, they did not do well.  So, again, I tend

4   to do, to be able to look at the persons who are kind of the

5   red flags, a lot of markers for not doing well in the

6   community setting.

7   Q          So your record is better with those people with red

8   flags as opposed to the people in his category?

9   A          But generally, I think that it's hard to look at an

10  accurate assessment of that because recidivism once someone

11  has been caught is only about 14 percent.  So, we're going to

12  only have a low number of people that are going to be in that

13  category anyway.

14  Q          And as an alumni of Butner, you may be familiar with

15  their study that a lot of folks come in with saying they've

16  never had a sexual encounter and some very large, maybe you

17  can tell me, 80 something percent, do you know what that study

18  was, it was in excess of 80, wasn't it?

19  A          They've had two separate studies, the numbers were

20  over in excess of 50 percent in each one, and in my experience

21  as well that's pretty typical for people to have --

22  Q          That they go to Butner and at that point after you

23  know they've denied it, they've been sentenced and then a

24  large majority or a majority at least will then admit to some

25  prior sexual encounter?

```
1   A        Yes.

2            MR. MacCOON:  Okay.  That's all I have, Your Honor.

3            THE COURT:  Anything else?

4            MR. HORST:  Not of this witness, Your Honor.

5            THE COURT:  May Dr. Moore step down?

6            MR. HORST:  Yes, sir.

7            THE COURT:  All right.  You may step down.  Thank

8   you, Dr. Moore.

9            THE WITNESS:  Thank you.

10           (Witness excused.)

11           THE COURT:  Do you have any other witnesses, Mr.

12  Horst?

13           MR. HORST:  I do, Your Honor.  Your Honor, I would

14  like to call Jim Tollison.

15           THE COURT:  All right.  Come forward, Mr. Tollison.

16  Come up here to the witness stand and right before you have a

17  seat, raise your right hand and Ms. Scott will swear you in.

18                              JIM TOLLISON,

19  called as a witness at the instance of the Defendant, being

20  first duly sworn, was examined and testified as follows:

21           THE COURT:  Have a seat and make yourself

22  comfortable.  Whenever you're ready to proceed, you may

23  proceed, Mr. Horst.

24                        DIRECT EXAMINATION

25  BY MR. HORST:
```

```
1    Q         Please state your name.

2    A         Jim Tollison.

3    Q         How are you employed?

4    A         I'm a retired pastor.

5    Q         And do you still attend church at the church that

6    you were a pastor at?

7    A         Yes.

8    Q         And how long were you pastor there?

9    A         Thirty years.

10   Q         Is this the church that Mr. Travis King attends?

11   A         Yes.

12   Q         All right.  Were you present on an occasion when Mr.

13   King asked the current pastor to make a statement to the

14   church?

15   A         Yes, uh-huh.

16   Q         And were you present for that statement to the

17   church?

18   A         Yes, I was.

19   Q         And I'm not trying to put you on the spot, if you

20   don't recall at all that's fine, but do you recall generally

21   when that was, what month?

22   A         It was probably late September, early October.

23   Q         Okay.  Let me ask you this first.  How long have you

24   known Mr. King, Travis King?

25   A         His whole life.
```

1    Q        All right.  What, if you would, just in your own

2    words explain at the time that Mr. King gave this statement to

3    the church, explain how it came about and what he said and

4    what you observed in general.

5    A        Well, it came about because I think that people had

6    became aware that Travis had had the problem.  And he had

7    counseled with our pastor.  And he asked the pastor if he'd

8    be, if he would allow him to come into the church and ask the

9    church to forgive him, confess a sin and forgive him of that

10   sin.  And he came forward after a service one night and he did

11   that.  He did it.  It was a voluntary thing for Travis to do.

12   He wanted to do that.  And the church understood and forgave

13   Travis.  And he's proven up until now the actions he's taken

14   he's worthy of that forgiveness.

15   Q        Just tell me briefly a little bit about the

16   character of Travis King that you knew before this conduct

17   came to light.  What was Travis like?

18   A        He was above average fellow probably in the

19   community.  He's never having any problems with anything.

20   He's always a good teenager.  He never gave the family any

21   problems.  He had -- he went to school, paid his way through

22   school.  And he was a surveyor for the TVA.  And he would take

23   part in activities around church.  We were building a new

24   building, Travis did all of the surveyor work, the layout work

25   and things of that nature, and site preparation.  And he gave

1    quite a bit of time doing that.  He's the type individual that

2    made contributions around the church there.

3    Q         Now, I think that this is pretty well obvious

4    already, but so after Travis was arrested, or not arrested but

5    this information came to light --

6    A         Uh-huh.

7    Q         -- it sounds as if you're stating the church

8    continued to be very supportive of Travis.  Is that correct?

9    A         Yes, very much so.

10   Q         If Travis were released at whatever point in the

11   future, not if, but when he's released, do you anticipate the

12   church will continue to offer him community support?

13   A         Absolutely.

14             MR. HORST:  No further questions, Your Honor.

15                         CROSS-EXAMINATION

16   BY MR. MacCOON:

17   Q         Pastor Tollison, from knowing Mr. King his whole

18   life, would you have ever predicted he would be involved with

19   child pornography?

20   A         No.

21   Q         So, it's hard to tell what people will do in the

22   future, isn't it?  I mean, you can be wrong about people in

23   your judgments?

24   A         Possibly, yes.

25   Q         And you would have been -- you would have said he

```
 1    would never do this, but he did do it, didn't he?

 2    A       Uh-huh.

 3            MR. MacCOON:  Thank you, sir.

 4            THE COURT:  Anything else?

 5            MR. HORST:  No, Your Honor.

 6            THE COURT:  May this witness step down?  All right.

 7    You can step down.

 8            (Witness excused.)

 9            MR. HORST:  I'm sorry, Your Honor.  Yes, sir, he may

10    step down.  Judge, I have two more witnesses, brief character

11    witnesses.  At this time, I would like to call Ms. Reed.

12            THE COURT:  Okay.  Come forward to the witness stand,

13    and right before you sit down, raise your right hand and Ms.

14    Scott will swear you in.

15                            DEBORAH REED,

16    called as a witness at the instance of the Defendant, being

17    first duly sworn, was examined and testified as follows:

18            THE COURT:  Have a seat.  Once you're comfortable,

19    let Mr. Horst know, and you can proceed.

20                          DIRECT EXAMINATION

21    BY MR. HORST:

22    Q       Please state your name.

23    A       Deborah Reed.

24    Q       And, Ms. Reed, what is your relationship with Travis

25    King?
```

```
 1   A        He's my son-in-law.

 2   Q        All right.  This is somewhat obvious, but I can

 3   imagine you were very shocked and hurt and many things when

 4   you heard about what Travis had been involved in.  Is that

 5   correct?

 6   A        That's correct.

 7   Q        Despite all of that, how do you feel about Travis

 8   today?

 9   A        I love him like a son.

10   Q        And let me just ask you the obvious question.  How

11   could you -- this man is married to your daughter, is the

12   father of your granddaughter, how could you continue to

13   support him when he was involved in something of this nature?

14   A        Well, I just believe that he made a mistake, a

15   terrible mistake.  He knows it was wrong.  We all know it was

16   wrong.  But he's just always been so good and so respectful in

17   our family.  And, you know, he's always attended all of our

18   family functions.  This is a young man who when we sit down to

19   eat dinner and he has cap on takes his cap off, bows his head,

20   and never ever leaves his hat on.  This is the kind of respect

21   he had for us and for the Lord.  And he was always wonderful

22   to my daughter and to my little granddaughter, and I have two

23   other granddaughters that belong to my son, and they loved him

24   like a brother, you know.  He was just always so good to them.

25   My whole family has stood beside Travis through this and
```

1    several of my family members are here today.  We just -- we

2    love him.  And he's not a bad person.  I feel that he just

3    made a mistake.  And we just want him to get to come home so

4    he can put his family back together.

5              MR. HORST:  Thank you.

6              THE COURT:  Cross-examination?

7              MR. MacCOON:  No questions, Your Honor.

8              THE COURT:  All right.  May this witness step down?

9              MR. HORST:  Yes, sir.

10             (Witness excused.)

11             THE COURT:  Call your next witness.

12             MR. HORST:  Candace King.

13             THE COURT:  Right before you have a seat, raise your

14   right hand, and Ms. Scott will swear you in.

15                          CANDACE KING,

16   called as a witness at the instance of the Defendant, being

17   first duly sworn, was examined and testified as follows:

18                       DIRECT EXAMINATION

19   BY MR. HORST:

20   Q         Please state your name.

21   A         Candace King.

22   Q         Ms. King, you've actually prepared a statement that

23   you wrote down before we came into court today.  Is that

24   right?

25   A         Yes, sir.

1    Q          Let me just ask you, would you prefer I ask you

2    questions or would you feel more comfortable just reading the

3    statement to the Court?

4    A          I'll be comfortable with either one.

5    Q          Let me just ask you as much as I've asked your

6    mother.  When you became aware of what Travis had been doing,

7    what kind of emotions or thoughts did you have?

8    A          I was very blown away.  I had no idea.  Shocked.

9    Scared.  But who wouldn't have been, so.

10   Q          But despite that, you decided to remain married to

11   and to support Travis?

12   A          Yes.  Yes.

13   Q          Why is that?

14   A          I love him very much.  And he's a very good man.

15   He's never been any threat to me or my two-year-old daughter.

16   He's a good father.  She needs her father.  She's asked about

17   him every day.  She doesn't understand, you know, where he's

18   at.  And she needs him home, so.

19              MR. HORST:  That's all I have, Your Honor.  Thank

20   you.

21              THE COURT:  Any cross-examination?

22              MR. MacCOON:  No.  Thank you, Your Honor.

23              THE COURT:  You may step down.  Do you want to read

24   the statement?

25              THE WITNESS:  May I?

1   THE COURT:  Go ahead and read your statement.

2   THE WITNESS:  Okay.  I just want to let you know,

3   Your Honor, I am standing here today to plead for my husband

4   to --

5   THE COURT:  Please speak into the microphone.

6   THE WITNESS:  Okay.  Sorry.  To just let him come

7   home today.  To allow him to be home to put our family back

8   together.  To give him a second chance.  He really deserves a

9   second chance.  We all love him.  As you can see that our whole

10  room is full of people that love him and care for him and want

11  him back.  And my little girl really needs a father.  She just

12  she needs a father.  And he's a good one.  He did make a

13  horrible mistake, and I wouldn't want to make any excuses for

14  what he did, because I know that it's very terrible what he

15  did, but I do believe that he deserves a second chance.  So,

16  I'm just asking you to please to consider that.

17  THE COURT:  Thank you very much, Ms. King.

18  THE WITNESS:  Thank you.

19  (Witness excused.)

20  THE COURT:  All right.  Mr. Horst, do you have any

21  other proof?

22  MR. HORST:  Mr. King would like to make a statement,

23  Your Honor.

24  THE COURT:  Well, before I hear from Mr. King -- does

25  the government have any proof, Mr. MacCoon?

```
 1          MR. MacCOON:  No, Your Honor.

 2          THE COURT:  All right.  Here's what I'm going to do

 3     in this case before -- I feel that I need more information in

 4     order to fashion an appropriate sentence for Mr. King in this

 5     case, and, particularly, based upon what I heard from Dr.

 6     Moore, I am going to order that Mr. King submit to an

 7     independent psychological evaluation by a psychologist of the

 8     Court's choosing.  All right.  I'll put down an order today.

 9     The court psychologist will try to evaluate Mr. King just as

10     soon as we can.  We'll endeavor to try to expedite that to the

11     extent possible and get the report back, but it may take

12     awhile.  But I think that under the circumstances that the time

13     will enable the Court to fashion a better sentence.

14          Now, Counsel, I will, once the Court receives its

15     evaluation and the order will reflect this, I will order that

16     the evaluation be provided in confidence to counsel on both

17     sides.  Obviously, it will be filed under seal with the Court.

18     It will be that.

19          Now, you know, Mr. MacCoon, let me say this.  And, I

20     mean, of course, as you know, we get a lot of these cases from

21     the FBI and the TBI and the government to this point has very

22     sparingly, if ever, you know, offered its own psychological

23     evaluation of a defendant in this situation.  I increasingly

24     see a need for the Court to have more information, so I guess

25     the reason I'm saying this, you need to pass along to the
```

relevant law enforcement agencies that -- and I don't mean
this in a pejorative manner, but there are going to be limits
to their ability to bring these cases on the cheap so to speak
when we get to sentencing phase, while it is certainly
obviously a technical violation of the statute itself, that is
of limited assistance to the Court in fashioning an
appropriate sentence in this case. So, you know, I suspect
that there is going to be resistance from the law enforcement
community about having to hire psychologists because it may
have the affect of making the bringing of these cases more
expensive and slow them down a little bit, but I feel that the
assistance to the Court in fashioning appropriate remedies in
these cases that so often entail very complex psychological
issues that the Court has limited ability to deal with and
does its best with expert advice, that the Court, you know,
this report is going to be done on the Court's dime, the next
time, it may have to be done on the government's dime. Okay.
That's not directed at you personally, but you need to pass
that along to the appropriate law enforcement agencies so they
need to be thinking about that.

          So, I'm going to continue this sentencing hearing.
It's not that I didn't want to hear from Mr. King today, but I
think that might be more appropriate once the Court has this
additional information. And, Counsel, you may have additional
submissions you may want to make to the Court after you've

1   received this additional information.  Because I would like as

2   full an exposition from both sides as possible.

3           Now, Mr. Horst, you haven't actually said this or

4   maybe you did in your papers, I mean, are you -- and you don't

5   have to commit to this -- are you seeking a probationary

6   sentence with outpatient treatment?

7           MR. HORST:  Yes, sir.  Yes, sir.

8           THE COURT:  Well, I mean, you know, my range is zero

9   to 10, so that would be within.  And I presume at this point,

10  Mr. MacCoon, without putting you on the spot the government is

11  likely to oppose that.  Right?

12          MR. MacCOON:  Given the advisory guidelines, yes,

13  Your Honor.

14          THE COURT:  Well, we're going to have to work it out

15  in the case.  Mr. Horst, what did you want to say?

16          MR. HORST:  Judge, I never know where to go with this

17  because technically polygraphs are not admissible, but they

18  have become standard of care --

19          THE COURT:  They're not admissible in evidence, but

20  as you know in sentencing proceedings the rules of evidence

21  don't apply.

22          MR. HORST:  Mr. King stands ready if part of the

23  examination --

24          THE COURT:  It probably will entail a polygraph.

25          MR. HORST:  Yes, sir.

```
1           THE COURT:  So, I mean, that's, you know, that's --
2    it will be whatever the Court -- the Court will put in its
3    order somewhat, but, I mean, the Court has standard experts
4    that it uses in the case.  But what I'm trying to make clear,
5    Counsel, in addition to this additional forensic evidence,
6    there may be additional arguments that you may want to make,
7    submit in to the Court in advance of the sentencing date.  I'm
8    going to continue this sentence indefinitely, not because -- we
9    do need to get on with this, however, the Court, again, has
10   made clear it needs additional information and will take
11   whatever time it will take to get that information.  We will
12   endeavor to get it as soon as possible, but you be thinking
13   about what your additional submissions will be.  Yes, sir.  Mr.
14   MacCoon.
15           MR. MacCOON:  I would like to point out that we can't
16   force a defendant to take a psychosexual --
17           THE COURT:  I understand that.  I understand that you
18   can't and the Court can.  But, I mean, it may be, let me ask
19   you this, in this case, have you even asked Mr. Horst if they
20   would consent, I mean, you know?
21           MR. MacCOON:  Well, they already had -- they went
22   right into a psychosexual evaluation and she's the person who
23   performs for the court in the middle district so we thought she
24   had --
25           THE COURT:  I'm not being critical of that.
```

1          MR. MacCOON:  Yeah.

2          THE COURT:  But I'm just saying, you know, that

3    really my comment earlier about the law enforcement agencies, I

4    understand you can't, you don't have the ability, but that

5    doesn't mean you can't request the ability to do that at some

6    point.  And really my whole point there is rather than impose

7    the entire burden on the Court on this thing, I mean, if

8    something can be done, I mean, you know, Mr. -- well, at any

9    rate, I'll just leave it at that.  That's what -- I've said

10   what I'm going to do in this case.

11         All right.  Anything else, Counsel?

12         MR. HORST:  No, Your Honor.

13         THE COURT:  Then I'm going, I am going to continue

14   this sentencing hearing until we have additional information.

15   Mr. Horst, and I'm going to put the burden on you principally

16   in consultation with Mr. MacCoon, once you get this report and

17   once you feel that you've had adequate opportunity to absorb

18   it, getting in any of your submissions, for you to make a

19   motion to reset this sentencing.  Okay?

20         MR. HORST:  Yes, sir.

21         THE COURT:  Whenever you think it's appropriate.

22         All right.  Anything else, Counsel?

23         MR. HORST:  No, sir.

24         MR. MacCOON:  No, Your Honor.

25         THE COURT:  All right.  Then thank you.  By the

```
1    way -- well, let me just leave it at that.
2            All right.  Court be in recess until 2:00 p.m.
3                        END OF PROCEEDINGS
4
5            I, Shannan Andrews, do hereby certify that I
6    reported in machine shorthand the proceedings in the
7    above-styled cause held March 29, 2010, and that this
8    transcript is an accurate record of said proceedings.
9
10                           s/Shannan Andrews
                             Shannan Andrews
11                       Official Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```